59 N.J. Super. 288 (1960)
157 A.2d 533
CITY OF BAYONNE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT,
v.
THOMAS J. DOUGHERTY, DENNIS P. COLLINS, WALTER A. NUGENT AND OWEN LAVAN, AND DEPARTMENT OF CIVIL SERVICE OF THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1960.
Decided January 27, 1960.
*289 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. William Rubin argued the cause for appellant.
Mr. Max A. Boxer argued the cause for the individual respondents.
Mr. William L. Boyan, Deputy Attorney General, argued the cause for respondent Department of Civil Service (Mr. David D. Furman, Attorney General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Bayonne appeals from a judgment of the Civil Service Commission ordering salary increases to be paid employees in the city sewer department on the ground that the withholding of such increases was discriminatory.
The city is governed by a board of commissioners under the Walsh Act, R.S. 40:70-1 et seq. Alfred V. Brady was *290 elected commissioner at the May 1955 municipal election. The Department of Revenue and Finance was assigned to him as Director. The sewer and water utilities, combined in one operation, were part of the department, as were the offices of the city treasurer, tax collector and city attorney. The total number of persons employed in the department, permanent as well as a few temporary, was 140. On February 10, 1958 Commissioner Brady granted a "general" salary increase of about $200 to some 70% of the employees in his department. All of the water service employees, about 92 in number, received the increase. None of the 27 sewer service employees was so benefited, except for one who had been designated foreman. All raises were within the common salary range of $3,909-$5,079.
The sewer department employees complained to Commissioner Brady and the Civil Service Commission about their failure to receive a raise. The Commission was then in the process of conducting a reclassification survey in Bayonne. It investigated the complaint and, as a result, a conference with Commissioner Brady was held in September 1958, attended by Executive Assistant Merrigan, in charge of the Commission's Newark office, Civil Service Chief Examiner and Secretary Farrell, and the employees' legal representative, among others. The purpose of the conference was to determine the basis for the complaint and whether the problem could be resolved without formal hearing. At this conference the Civil Service representatives suggested the possibility of abolishing the "swing shift" differential paid to sewer employees for working on less desirable shifts, and using the money so saved to give them the increase they wanted. It was pointed out that this would improve their pension status. The differential amounted to about $291 a year for each employee. Commissioner Brady eventually adopted the suggestion; the differential was abolished, and on January 27, 1959 a $200 increase was given to all sewer department employees except three supervisory personnel and two laborers. The increase was not retroactive to February 10, *291 1958, the date when the water employees had gotten their raise.
On March 26, 1959 Commissioner Brady ordered salary increases of $100 to $300 for employees in the finance and water departments. No sewer employee was included.
Subsequently the individual respondents appealed to the Civil Service Commission, alleging discrimination in that the sewer department employees were denied normal salary increases granted to all other employees in the Department of Revenue and Finance as of February 10, 1958. At the Commission hearing Commissioner Brady testified that the sewer department was established about July 1954, and no employee there was in the city service before that time; that although all of the water department employees had considerably more service, their salaries for equivalent work were lower than those in the sewer department; and that in granting increases to the former in February 1958 it was for the purpose of bringing their salaries more into line with those of the sewer personnel. He said that even after those increases were given, the salaries of the water department employees were still generally lower than those in the sewer department. The Commissioner denied there was any favoritism in giving the increases; he had taken into consideration recommendations of the division heads and used his own judgment; he said he was motivated by no other reasons than those stated.
However, respondents Collins and Lavan testified that when they went to see Commissioner Brady on behalf of the sewer employees to learn why they had been left out of the February 1958 general salary increase, they were told that the only reason was that a sewer employee "came up and was looking for his holiday premium time"; that the Commissioner's curiosity was aroused and he asked how much money was involved; that he was told it would be less than $2,000; and that he said, "As a matter of fact, you were within ten minutes of getting the raise, only I ordered the plates pulled because this man came up looking for holiday *292 pay." The Commissioner denied having made any statement to the effect that he had ordered the plates pulled. He also denied that he withheld the pay increase from the sewer employees because, as was suggested in Collins' testimony, he was irked by their seeking overtime pay. (The employees had been pressing their claim for overtime pay due for the last 4 1/2 months of 1957; they did not receive it until March 1959.) In any event, the fact remains that the sewer employees were not given their $200 increase until January 27, 1959, and it was non-retroactive.
Executive Assistant Merrigan testified at the Civil Service hearing that when he and Farrell met with Commissioner Brady in September 1958 and inquired why he had not given a salary increase to the sewer employees, he said that "a possible reason was that the employees in the sewage plant were not competent and therefore not entitled to the increases. * * * He didn't say it was actually the reason, but it might be one of the reasons why increases were not granted." That reason was not pursued further, but the Commissioner "indicated that there may have been other reasons as well why the increases were not granted."
In its decision, determination and order the Civil Service Commission said:
"It is difficult for the Hearing Commissioners to believe that all employees in the Sewage Department were excluded from what amounted to general departmental increases solely because their average salaries were supposedly higher than fellow workers in the Water Department. The long delays in the negotiations and the differences of opinion as to what transpired in a conference with Civil Service officials and elsewhere indicate a policy of withholding the increases for the 1958 working year. Further, after receiving the $200 increases January 27, 1959, which were not made retroactive, the Sewage Department employees were omitted, again, from the 1959 increases awarded to a large percentage of employees, supposedly on a merit basis."
The Commission concluded that the sewer department employees were discriminated against in the distribution of salary increases for the year 1958; that Commissioner Brady's *293 explanation for withholding the increases because the salaries of the sewer employees were higher than those in the water department, "should not be resolved by withholding salary increases. Such an inequity, if it exists, is a matter that should be adjusted through a reclassification program which, in fact, is currently under way."
The City of Bayonne appeals on two grounds: (1) the Civil Service Commission had no jurisdiction to review the alleged discrimination and, in any event, (2) there was no proof of bad faith, and no discrimination existed. We need consider only the first point.
The Commission based its claim to jurisdiction on R.S. 11:1-7(d) and R.S. 11:5-1(d), as amended. R.S. 11:1-7(d) authorizes the Commission to enforce the provisions of Title 11, Civil Service, and the rules and regulations of the Commission made pursuant thereto, and to insure compliance therewith both within the service of the State and of any county, municipality or school district operating under the provisions of subtitle 3 (R.S. 11:19-1 et seq.). R.S. 11:5-1(d), as amended, provides that:
"The commission, in addition to the other duties imposed upon it by law, shall, as a body:

* * * * * * * *
d. Hear appeals, either as a body or through one or more members designated by a majority thereof to hear such appeals, of persons in the classified service sought to be removed, demoted in pay or position, suspended, fined or otherwise discriminated against contrary to the provisions of this subtitle, and render decisions thereon and require observance of the decisions as herein provided;"
Neither the Commission nor the city has pointed to any statutory provision expressly giving the Commission jurisdiction to hear an appeal based upon a complaint of discrimination of the type herein alleged.
We find nothing in the Civil Service Act, R.S. 11:1-1 et seq., or the Civil Service rules and regulations adopted under it, specifically granting authority to the Civil Service Commission to make the determination brought here for *294 review. R.S. 11:5-1(d), quoted above, gives the Commission only the general power to hear appeals of persons in the classified service sought to be removed, demoted in pay or position, suspended, fined or "otherwise discriminated against contrary to the provisions of this subtitle." Our review of Title 11 indicates a limited number of sections dealing with discrimination. For example, R.S. 11:17-1 (L. 1930, c. 176, § 38) provides that no person "in or seeking admission to the classified service shall be appointed, demoted or removed or be favored or discriminated against because of his political or religious opinions or affiliations." The earliest civil service statute, L. 1908, c. 156, § 24, as amended by L. 1917, c. 236, § 1 (R.S. 11:22-11) is to similar effect: no person in the classified service may be "removed, discharged, reduced in pay or position or otherwise discriminated against because of his religious or political opinions or affiliations." And in R.S. 11:10-8, as amended by L. 1947, c. 123, relating to appointments to any position in the competitive class where the person appointed is graded lower in the examination than any other person whom the appointing officer might lawfully have appointed, the appointing officer is required to certify under oath that what he did was not done "by reason of race, color, political faith or creed of any person so appointed or given employment, or any person not appointed or given employment."
This case does not, of course, involve a situation where a person in the classified service was removed, demoted in pay or position, suspended or fined. There is no claim that any of the sewer employees were reduced in salary, for whatever reason; in such a case the matter would be reviewable by the Civil Service Commission. See Scancarella v. Department of Civil Service, 21 N.J. Super. 11 (App. Div. 1952). Nor is this a case where salaries were increased beyond the limit fixed for the grade in which the office or position is classified, so as to constitute a promotion governed by R.S. 11:22-34, as amended.
*295 The single issue here is whether the Commission has authority to review the action of a municipality, taken through a department head like Commissioner Brady, in withholding salary increases from, or granting such increases to, one group of employees and not to another.
The Commission urges this court to uphold its jurisdiction over generally discriminatory action, even though such action may not come within the specific statutory prohibition of discrimination based on political or religious opinions or affiliations. It calls attention to Art. VII, Sec. I, par. 2 of the 1947 Constitution, requiring that "appointments and promotions" in the civil service of the State, and of such political subdivisions as may be provided by law, "shall be made according to merit and fitness," and argues that this language be given the broadest possible scope "to mean generally anything that may be of advantage to the employee or prospective employee." The argument continues that if the phrase "appointments and promotions" were taken literally and narrowly, it would be constitutional for the Legislature to provide for removal and discharge on grounds other than merit and fitness. However, the Civil Service Act, it is said, seems to have recognized the breadth of meaning of the constitutional provision: R.S. 11:4-2 not only repeats that appointments and promotions in the Civil Service shall be made according to merit and fitness, but goes on to provide that no person shall be "appointed, transferred, reinstated, promoted, reduced or dismissed" except as provided by statute.
We fail to see how the constitutional provision supports the Commission's position. The Constitutional Convention of 1947 merely wrote into the state charter what had for years been the keystone of New Jersey's personnel system. See L. 1908, c. 156, § 1, now R.S. 11:4-2; 2 Proceedings of the Constitutional Convention of 1947, 1126 (Report of the Committee on Executive, Militia and Civil Officers), and page 1133 (Committee Proposal, "Public Officers and Employees," Sec. I, par. 2); and see, generally, ibid. 1465, *296 Carpenter, "Civil Service  The Personnel Article in the State Constitution" (monograph). The Legislature has through the years, by the careful process of amendment and supplementation of the Civil Service Act, adopted such provisions as policy and experience indicated were necessary, all to the end of strengthening the merit system. We will not read the cited section of the Constitution to mean any more than it says, nor carry the legislative intention beyond what is expressly or by clear implication called for by the statutes.
Nor do we find support for the argument advanced by the Commission in its citation of R.S. 11:4-1, which declares the purpose of the Civil Service Act to be to provide a modern personnel system for positions in the classified service, and the application of correct business principles in (among other things) "the development, adoption, and administration of equitable compensation schedules for each class of positions."
The Commission seeks to bolster its claim of jurisdiction by an argument addressed to its expertise in personnel matters. The claim is made that because of the responsibility the Commission has for classifying municipal employees and suggesting compensation schedules, including the suggesting of increments within a range (see R.S. 11:24-1), and for supervising the payment of compensation to persons in the classified service (see R.S. 11:22-20, as amended by L. 1947, c. 200), it has acquired an expertise on the whole subject of compensating employees. Further, in exercising its jurisdiction over promotions, suspensions, removals and transfers, the Commission has acquired the ability to discern the presence or absence of discrimination in particular cases. All this may readily be admitted, but it does not follow that the Commission may exercise a power not given it by statute to review the action of the appointing authority in withholding increases, unless the situation is one where they were withheld for political reasons or because of the religious belief of the aggrieved party.
*297 In Tanis v. Passaic County, 126 N.J.L. 303 (E. & A. 1940), certain county jail keepers instituted suit in the former Circuit Court, complaining that the freeholder board, in carrying out a program of general retrenchment of salaries during the depression years 1933, 1934 and 1935, pursuant to L. 1933, c. 13, had reduced their salaries 25% and those of court attendants only 20%. A statute provided that in counties like Passaic jail keepers were to be paid the same salary as court attendants. Plaintiffs sought the 5% difference. The Circuit Court dismissed the complaint on the ground that under R.S. 11:22-38 plaintiffs had a "complete administrative remedy to correct this discrimination effected by a reduction in compensation." The Court of Errors and Appeals held to the contrary, declaring that R.S. 11:22-38 ("No officer, clerk or employee holding a position in the competitive class shall be removed, discharged, fined or reduced, * * * until he has been furnished with a written statement of the reasons for such action by the appointing authority and been allowed a reasonable time to make answer thereto. * * * The action of the appointing authority ordering or directing such removal, discharge, fine or reduction shall not take effect until approved by order of the commission"), manifestly did not clothe the Civil Service Commission with jurisdiction to review the validity of the freeholder board action. Referring to the Commission, the court said:
"* * * The powers of this tribunal are special and limited. It possesses only such authority as has been expressly conferred, and such as by fair implication and intendment is incident to the power expressly conferred for the achievement of the general legislative policy. A reasonable doubt of the existence of a particular power is to be resolved against it."
The same thought was expressed in Newark v. Civil Service Commission, 115 N.J.L. 26, 29 (Sup. Ct. 1935); Maguire v. Van Meter, 121 N.J.L. 150, 151 (E. & A. 1938); and in Belfer v. Borrella, 6 N.J. Super. 557, at page 560 (Law Div. 1949), as well as the affirmance appearing in 9 N.J. *298 Super. 287, at page 292 (App. Div. 1950). None of these cases, however, dealt with the problem presented in this case. And in Borough of Park Ridge v. Salimone, 21 N.J. 28, 44-45 (1956), former Chief Justice Vanderbilt, speaking for a unanimous court, said:
"* * * But a liberal policy of construction [in effectuating the policy of the Civil Service Act] is still no license to disregard the clear meaning of the law as to the basic purpose sought to be accomplished by the statutes, and any doubt on this score must be resolved in favor of the express provisions of the statutes [citing the Tanis, Maguire and Newark cases, above]."
Almost coincidentally with the coming down of the Supreme Court decision in Salimone, this court held in Swede v. Clifton, 39 N.J. Super. 366, 373, 374 (1956), affirmed, 22 N.J. 303 (1956), that the Civil Service Commission "is a quasi-judicial statutory tribunal and possesses no jurisdiction except that which is expressly conferred by statute. * * * Nowhere in the Civil Service Act can there be found any authority in the Commission to pass upon anything other than violations of the act and its own rules. * * *"
The Commission points to Gibraltar Corrugated Paper Co. v. North Bergen Township, 20 N.J. 213 (1955), and urges that just as the statutes limiting the jurisdiction of the administrative agencies there involved were expanded beyond their strictly literal scope to safeguard the constitutional right of freedom from discrimination in taxation, so should the literal provisions of the Civil Service Act granting the Commission jurisdiction be expanded, if necessary, beyond their strict scope to safeguard employees' rights. Gibraltar dealt with a particular problem, the true value of real property, and has no relevance to the issue before us, statutorily or otherwise.
The area within which the Civil Service Commission seeks to assert jurisdiction in the present case comes close to impingement upon the general administrative authority of a city commissioner to conduct his department, as provided *299 by the Walsh Act, with accompanying reasonable latitude for exercise of discretion as to the compensation to be paid department employees. Before the Commission can be declared to have supervision over his judgment in that regard, as is here claimed, the Legislature should express its intention to that effect, rather than such a result being effected by judicial implication of an intent not fairly indicated by the Civil Service Act as it stands.
The Commission having been without jurisdiction to act in the premises, its judgment must be set aside. Reversed.