NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0056-13T2

IN THE MATTER OF THE REALLOCATION
OF THE PROBATION OFFICER AND
PROBATION OFFICER, BILINGUAL IN
SPANISH AND ENGLISH TITLES FROM
THE COMPETITIVE TO THE NON-
COMPETITIVE DIVISION OF THE
CAREER SERVICE.

_____

APPROVED FOR PUBLICATION

July 22, 2015

APPELLATE DIVISION

Argued April 22, 2015 — Decided July 22, 2015

Before Judges Alvarez, Waugh, and Carroll.

On appeal from the New Jersey Civil Service
Commission, Docket No. 2013-3251.

Lynsey A. Stehling argued the cause for
appellant Probation Association of New
Jersey (Law Offices of Daniel J. Zirrith
LLC, attorneys; Daniel J. Zirrith, of
counsel; Ms. Stehling, on the brief).

Todd A. Wigder, Deputy Attorney General,
argued the cause for respondent New Jersey
Civil Service Commission (John J. Hoffman,
Acting Attorney General, attorney; Lewis A.
Scheindlin, Assistant Attorney General, of
counsel; Mr. Wigder, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

The Probation Association of New Jersey (Association)
appeals the final administrative agency decision of the New
Jersey Civil Service Commission (Commission) concerning the

manner in which the Administrative Office of the Courts (AOC) selects and appoints candidates for the titles of Probation Officer and Probation Officer, Bilingual in Spanish and English (Bilingual Probation Officer). We reverse and remand for further consideration consistent with this opinion.

## I.

We discern the following facts and procedural history from the record on appeal.

On December 5, 2011, pursuant to N.J.A.C. 4A:1-4.3, the AOC requested the Commission to establish a one-year pilot program to replace competitive testing for the Probation Officer and Bilingual Probation Officer titles with an evaluation system.[1] The AOC explained that the pilot program was necessary because "at least four vicinages [had] exhausted [their] current pool and several others [were] close to exhausting their pools" for the Bilingual Probation Officer title. The AOC made no such factual assertion with respect to the Probation Officer title.

The proposed program would replace the traditional system of competitive testing that is generally used throughout the State government with an evaluation program designed to focus on

---

[1] The AOC also sought to replace the four-month working test period provided by N.J.A.C. 4A:4-5.2(b)(2) with a Probation Officer Trainee title that would provide a full year of training and evaluation, but subsequently withdrew that request.

a candidate's communication skills, personal motivation, interpersonal skills, analytical skills, reasoning ability, personal development, and time management skills. Candidates' credentials would be reviewed and scored based on education and work experience. The cover letters and resumes would be evaluated and rated based on the number of errors in spelling, grammar, and punctuation. Candidates with the highest scoring resumes would be selected for a structured panel interview, be required to complete a timed writing sample, and be evaluated for promptness and neatness. Successful candidates would return for a second structured interview, after which selected finalists would receive offers of employment. The program would be administered by vicinage or a regional group of vicinages, as appropriate. The AOC's Division of Equal Employment Opportunity/Affirmative Action would review the candidate pools for diversity, and preference for veterans would be taken into consideration.

The purpose of the proposed system was to allow for "a more flexible process for recruitment and selection than the traditional civil service testing process provides." The AOC was particularly interested in oral examinations, which it believed to be "a critical element of the selection process" and which the Commission would not be able to administer because of

the large number of candidates. In addition, the AOC explained that "the flexibility of the proposed pilot program would allow vicinages the opportunity to proactively recruit before their candidate pool is empty," whereas the Commission only administers its examinations at set intervals.

The proposal was opposed by the Association, which submitted opposition to the Commission. The Association argued that the proposal violated article VII, section 1, paragraph 2 of the New Jersey Constitution, which requires public employees to be selected on the basis of "merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive." It further argued that the AOC had not established sufficient need for the change and that past instances of noncompetitive hiring had not been successful. Finally, the Association called for a fact-finding hearing in the Office of Administrative Law (OAL). The Association subsequently argued that any problem caused when hiring pools run low could be solved by interim, noncompetitive appointments pursuant to N.J.A.C. 4A:3-1.2.

On June 21, following further submissions by the parties and the AOC's acceptance of modifications suggested by the Commission's staff, the Commission issued a final administrative

order approving the pilot program.[2] The year-long pilot program was originally to have been implemented on July 1, 2012, but the Commission subsequently delayed the implementation date to November 1 at the AOC's request.

In its decision, the Commission concluded that the program was consistent with N.J.A.C. 4A:3-1.2(c)(2), which allows a job title to be placed "in the noncompetitive division on an ongoing or interim basis" if the Commission determines "that it is appropriate to make permanent appointments to the title and . . . [c]ertification procedures based on ranked eligible lists have not or are not likely to meet the needs of appointing authorities due to such factors as salary, geographic location, recruitment problems, and working conditions." It explained:

> In this regard, the AOC has indicated that it has experienced problems maintaining a sufficient pool of qualified and interested candidates in all geographic locations during the duration of eligible lists resulting from competitive testing. Indeed, one of the primary goals of the pilot program is to address this difficulty by providing the [AOC] with a way in which to continuously recruit qualified applicants . . . with announcements directed to particular regions of the State on an as-needed basis.

---

[2] The Association appealed that decision. That appeal was dismissed as moot after the Commission approved use of the noncompetitive process on an ongoing basis.

The Commission found that the program would involve "structured recruitment and selection," which would focus on "six broad-based competencies for successful performance in the . . . titles," namely, communication, personal motivation, interpersonal skills, analysis and reasoning, self-development, and time management. "The competencies and assigned weights [were] consistent with a job analysis performed by the Division of Selection Services in 2009 for the affected titles."

The program's success was to be evaluated by comparing the previous years' and the pilot program's appointment demographics, termination demographics, and discipline demographics. The timeliness of appointments would also be compared, "considering average recruitment time, average time prior to appointment, average turnaround time for bilingual test results, and average turnaround time for appointments." Lastly, managers and supervisors would be surveyed "regarding [the] quality, success, and commitment of [the] employees hired."

The Commission explained that the major benefits of the program would be

> the provision of greater flexibility in the recruitment and selection process for both the applicants and the AOC. In this regard, the process will allow a consistently refreshed pool of applicants to be considered for positions in specific geographic locations. This will provide more opportunities for individuals

6

interested in pursuing a career in this field as their application opportunities will not be limited to the set time frames within which the Commission announces and administers open competitive examinations for the titles, which may not necessarily coincide with time period of peak interest, such as college graduation. The AOC will likewise benefit from a fresh pool of applicants and less likelihood of the exhaustion of the candidate pool with interest in less populated or popular geographic areas of the State.

On May 21, 2013, less than seven months into the pilot program, the AOC applied for permanent reallocation of the Probation Officer and Bilingual Probation Officer titles from the Commission's competitive division to its noncompetitive division. In support of its application, the AOC reported on the implementation of the pilot program.

According to its report, the AOC developed, posted, and distributed a statewide notice of vacancy permitting candidates to apply for positions in up to four vicinages. Resumes were assigned to appropriate vicinages for review and ranking under the uniform scoring system developed by the AOC with assistance from the Commission's staff. Candidate information was entered into a centralized database.

The AOC then scheduled regional recruitment events. Candidates scoring five or better on their resume and all veterans were invited to attend. The candidates were scheduled

in groups of ten at hourly intervals. After check-in and an informational presentation, each candidate participated in a structured interview, completed an essay, and was then free to leave.

During the structured interview, candidates were asked the same series of questions at each event. Panelists were provided with a response guide to ensure uniform, statewide scoring. The writing sample topic was the same at each event. There was also a scoring guide for the essays.

Candidates were assigned a final score based on their performance at the recruitment event. Seventy-five percent of the score was based on the structured interview, ten percent on the writing sample, five percent on promptness, and ten percent on attention to detail. Candidates scoring 60 or below were no longer considered for appointment. The remaining candidates were then banded into five numerical categories[3] for the purpose of creating candidate pools of three or more candidates. If there were fewer than three candidates in a band, candidates from the next lower band could be included to bring the pool up to three. Veterans scoring 61 or above received preference regardless of score.

---

[3] The categories were 91 to 100, 81 to 90, 71 to 80, 61 to 70, and below 60.

A-0056-13T2

The AOC provided the Commission with the results of the pilot program, based on the evaluation criteria established in its June 21, 2012 decision. Of 2401 applicants, 523 were selected to attend one of the recruitment events, which were held in Burlington, Camden, Ocean, Passaic, and Somerset counties. The process resulted in forty-six appointments over a six-month period, in contrast to eighty-three, fifty, and forty-six appointments in the previous three years respectively.

There was one termination of an appointee during the six-month period. In the previous three years, there had been four, one, and six terminations respectively. Appointees were disciplined twenty-eight times during the six-month evaluation period, while new appointees in the previous three years had been disciplined seventy-two, fifty, and fifty times respectively.

During the pilot program, the AOC averaged 123 days, or approximately three months, from recruitment event to appointment. Over two-thirds of the managers and supervisors surveyed reported that the appointees were of high quality, with highly satisfactory performance and demonstrated commitment to succeed. No comparable surveys were provided for the prior three years during which appointments were made through the traditional competitive process.

A-0056-13T2

The Association continued to express opposition to the program and requested the Commission to defer its decision regarding the AOC's request that the program be made permanent pending resolution of its July 2012 appeal of the pilot program. Nevertheless, on July 18, the Commission issued a final administrative decision granting the AOC's request and implementing the noncompetitive program on a permanent basis.

In explaining its decision, the Commission summarized the positions of the parties and noted that the Division of Classification and Personnel Management (Division) had recommended approval. The Division had concluded that adoption of the program on a permanent basis would

> provide the AOC with the flexibility needed to more efficiently and quickly meet hiring responsibilities. Further, it [found] that the documentation presented by the AOC demonstrates a well-planned, fair, and equitable recruitment and selection process. Additionally, as set forth in N.J.A.C. 4A:3-1.2(c), certification procedures will not likely meet the needs of the AOC. [The Division] also note[d] that no eligible lists exist for the subject titles.

Citing N.J.A.C. 4A:3-1.2, the Commission concluded that

> ample reasons exist for the reallocation of the proposed titles to the noncompetitive division of the career service. It is clear that reallocation will provide the AOC with the flexibility needed to more efficiently and quickly meet hiring responsibilities. Certification procedures based on ranked eligible lists will not meet the AOC's needs

for immediate recruitment.  Further, the AOC submits sufficient documentation showing the success of the pilot program, which justifies its request to reallocate the subject titles to the noncompetitive division of the career service.

This appeal followed.

II.

On appeal, the Association makes the following substantive arguments:

POINT II: THE COMMISSION'S RULING APPROVING THE PILOT PROGRAM WAS ARBITRARY, CAPRICIOUS, AND UNREASONABLE BECAUSE IT ALLOWS THE VIOLATION OF THE NEW JERSEY CONSTITUTION AND TITLE 4A AND 11A

POINT III: THE COMMISSION'S RULING APPROVING THE PILOT PROGRAM WAS ARBITRARY, CAPRICIOUS, AND UNREASONABLE BECAUSE IT ALLOWS THE REPLACEMENT OF THE CURRENT TESTING PROCESS FOR PROBATION OFFICERS THROUGH OPEN COMPETITIVE PROCESS, WHICH HAS BEEN ENTIRELY SUCCESSFUL, WITHOUT PROPER GROUNDS FOR DOING SO

POINT IV: THE COMMISSION'S RULING APPROVING THE PILOT PROGRAM WAS ARBITRARY, CAPRICIOUS, AND UNREASONABLE BECAUSE IT IGNORES THE FACT THAT PRIOR INSTANCES OF NON-COMPETITIVE TESTING, SUCH AS SELECTION FOR MENTAL HEALTH PROBATION OFFICERS, HAVE RESULTED IN A HIGH PERCENTAGE OF SELECTED CANDIDATES WHO WERE DISCIPLINED OR TERMINATE[D]

POINT V: THE COMMISSION'S RULING APPROVING THE PILOT PROGRAM WAS ARBITRARY, CAPRICIOUS, AND UNREASONABLE BECAUSE THIS MATTER SHOULD HAVE BEEN PROPERLY HEARD BEFORE THE OFFICE OF ADMINISTRATIVE LAW DUE TO THE SIGNIFICANT CONSTITUTIONAL AND STATUTORY VIOLATIONS, AS WELL AS TO ENSURE THAT THE COMPETITIVE CIVIL

SERVICE TESTING IS NOT ABOLISHED FOR ALL TITLES

Our scope of review of an administrative agency's final determination is limited. In re Carter, 191 N.J. 474, 482 (2007). We accord a "strong presumption of reasonableness" to the agency's exercise of its statutorily delegated responsibilities. City of Newark v. Natural Res. Council, 82 N.J. 530, 539, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980). The burden of showing that the agency's action was arbitrary, unreasonable, or capricious rests upon the appellant. Barone v. Dep't of Human Servs., 210 N.J. Super. 276, 285 (App. Div. 1986), aff'd, 107 N.J. 355 (1987).

The reviewing court "should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008); see also Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9-10 (2009).

Absent arbitrary, unreasonable, or capricious action, or a lack of support in the record, "[a]n administrative agency's final quasi-judicial decision will be sustained." In re Herrmann, 192 N.J. 19, 27-28 (2007) (citing Campbell v. Dep't of

Civil Serv., 39 N.J. 556, 562 (1963)).  The court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs."  In re N.J. Pinelands Comm'n Resolution PC4-00-89, 356 N.J. Super. 363, 372 (App. Div.) (citing Brady v. Bd. of Review, 152 N.J. 197, 210 (1997)), certif. denied, 176 N.J. 281 (2003).  Nevertheless, we may not simply rubber-stamp an agency's decision.  In re Taylor, 158 N.J. 644, 657 (1999).

Although an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973), if substantial evidence supports the agency's decision, "a court may not substitute its own judgment for the agency's even though the court might have reached a different result," Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citing Clowes v. Terminix Int'l, 109 N.J. 575, 587 (1988)).

In 1986, the Legislature passed the current Civil Service Act, repealing Title 11 and establishing Title 11A of the New Jersey Statutes.  L. 1986, c. 112; Senate Revenue, Finance and Appropriations Committee, Statement to S. 1567, A. 2194, and S.

1829, (Sept. 8, 1986). In doing so, the Legislature made the following findings and declarations:

> a. It is the public policy of this State to select and advance employees on the basis of their relative knowledge, skills and abilities;
>
> b. It is the public policy of this State to provide public officials with appropriate appointment, supervisory and other personnel authority to execute properly their constitutional and statutory responsibilities;
>
> c. It is the public policy of this State to encourage and reward meritorious performance by employees in the public service and to retain and separate employees on the basis of the adequacy of their performance;
>
> d. It is the public policy of this State to ensure equal employment opportunity at all levels of the public service; and
>
> e. It is the public policy of this State to protect career public employees from political coercion and to ensure the recognition of such bargaining and other rights as are secured pursuant to other statutes and the collective negotiations law.
>
> [L. 1986, c. 112, § 11A:1-2.]

Title 11A gives the Commission the power to "[a]dopt and enforce rules to carry out [the Act] and to effectively implement a comprehensive personnel management system." N.J.S.A. 11A:2-6(d).

It is important to note for the purposes of this appeal that any waiver of traditional competitive examinations must, as a constitutional matter, be based on their impracticality. In In re Foglio, 207 N.J. 38, 40 (2011), the Supreme Court observed that

> [t]he New Jersey Constitution prescribes that Civil Service appointments "shall be made according to merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive." N.J. Const. art. VII, § 1, ¶ 2. The Civil Service Act, N.J.S.A. 11A:1-1 to 12.6, and the regulations promulgated thereunder, N.J.A.C. 4:4-1.1 to 7.12, in turn, implement those merit and fitness principles.

As we explained in Bayonne v. Dougherty, 59 N.J. Super. 288, 295-96 (App. Div. 1960) (citations omitted), appeal dismissed, 34 N.J. 240 (1961),

> [t]he Constitutional Convention of 1947 merely wrote into the state charter what had for years been the keystone of New Jersey's personnel system. The Legislature has through the years, by the careful process of amendment and supplementation of the Civil Service Act, adopted such provisions as policy and experience indicated were necessary, all to the end of strengthening the merit system. We will not read the cited section of the Constitution to mean any more than it says, nor carry the legislative intention beyond what is expressly or by clear implication called for by the statutes.

N.J.S.A. 11A:3-2 provides that "[t]he career service shall have two divisions, the competitive division and the noncompetitive division."  In establishing the noncompetitive division, the Legislature made the following findings:

a.   the   importance   of   fairness   and impartiality   in   State   employment   is recognized   in   Article   VII,   Section   I, paragraph 2 of the New Jersey Constitution which   provides   that,   "Appointments   and promotions in the civil service of the State shall be made according to merit and fitness to be ascertained, as far as practicable, by examination,   which,   as   far   as   practicable, shall be competitive";

b.   nevertheless,   the   framers   recognized that   appointments   to   certain   types   of employment   are   not   readily   made   through   a competitive examination process;

c.   accordingly,   in   implementing   the constitutional   provision,   the   Legislature has   provided   in   N.J.S.   11A:3-2   that   the career   service   shall   have   a   competitive division and a noncompetitive division;

d.   it was the purpose of the Legislature, in making this distinction, to provide for positions which cannot properly be tested for, such as lower-level jobs which do not require significant education or experience, to be filled without the need of competitive examination   but   with   civil   service protection for the employee;

e.   however,   recent   published   reports suggest   that   the   purpose   of   the noncompetitive division has been subverted by the transfer into that division of titles which   properly   belong   in   the   unclassified service   or   in   the   competitive   division   of

the career service, and the making of
appointments thereto;

f. the apparent reason for this misuse of
the noncompetitive division is to protect
political appointees prior to the beginning
of a new administration; and

g. in order to prevent this abuse of the
civil service system, there is need for a
statutory prohibition on the movement of job
titles and political appointees to the
noncompetitive division of the career
service during the final six months of the
Governor's term in office.

[N.J.S.A. 11A:3-2.1 (emphasis added).]

See also Senate State Government Committee, Statement to S. 2234

(Dec. 6, 1993) ("The purpose of the noncompetitive division is

to enable the State to fill lower-level jobs which do not

require significant education or training and for which a

competitive examination cannot easily be designed.").

We do not hold that only low-level positions may be

assigned to the noncompetitive division, but it is instructive

to note the purpose for which the noncompetitive division was

created and the Legislature's concern that it not be abused.

There may well be positions that require knowledge that is not

readily evaluated through competitive testing. See Benson v.

McCaul, 702 N.Y.S.2d 164, 166-67 (App. Div. 2000) (finding

competitive examination for Risk Management positions to be

impracticable "due to the dynamic nature of the [financial]

industry which rendered an examination virtually obsolete before completion of the competitive process"). And we can envision other circumstances, not involving low-level positions, in which a transfer to the noncompetitive division could be appropriate.

N.J.S.A. 11A:3-2 authorizes the Commission to "assign and reassign such titles to each division and [to] provide for movement, including promotion, of employees from one division to the other." N.J.S.A. 11A:3-1 authorizes the Commission to "assign and reassign titles among the career service." The Commission's regulations outline the parameters of how it exercises that authority.

N.J.A.C. 4A:3-1.2, the regulation at issue in this case, provides as follows:

> (a) The Civil Service Commission shall allocate and reallocate career service titles between the competitive and noncompetitive divisions.
>
> (b) A career service job title in the competitive division is subject to the competitive examination procedures of N.J.A.C. 4A:4-2, except as provided in N.J.A.C. 4A:3-3.2A.
>
> (c) A job title may be placed in the noncompetitive division on an ongoing or interim basis when it is determined by the Civil Service Commission that it is appropriate to make permanent appointments to the title and one or more of the following criteria are met.

1. Competitive testing is not practicable due to the nature of the knowledge, skills, and abilities associated with the job;

2. Certification procedures based on ranked eligible lists have not or are not likely to meet the needs of appointing authorities due to such factors as salary, geographic location, recruitment problems, and working conditions; or

3. There is a need for immediate appointments arising from a new legislative program or major agency reorganization.

(d) All appointees to noncompetitive titles shall meet the minimum requirements set forth in the job specification and satisfactorily complete a working test period.

(e) Prior to any reallocation from the competitive to noncompetitive divisions, whether on an ongoing or interim basis, an administrative review shall be conducted and notice of the proposed reallocation shall be sent to affected appointing authorities and negotiations representatives. The notice shall designate the period of time, which in no event shall be less than 20 days, during which written comment may be submitted, and may provide for a public hearing.

1. Data, reports, analyses, and other information utilized in the determination shall constitute the administrative record, and shall be available for review by affected employees, appointing authorities, and negotiations representatives.

2. After the comment period and the public hearing, if any, the Civil

A-0056-13T2

Service Commission shall issue a final administrative decision containing findings and conclusions with respect to the proposed reallocation, based upon the administrative record and any comment received, and implementation procedures.

(f) When a job title is reallocated from the competitive to noncompetitive divisions, the Commission's decision shall specify an effective date for reallocation.

1. Permanent employees in that title as of the effective date shall retain their permanent status in the noncompetitive division.

2. Probationary employees in that title as of the effective date shall continue serving their working test periods and, upon successful completion, attain permanent status in the noncompetitive division.

3. Provisional employees who remain in that title as of the effective date shall receive regular appointments and begin serving their working test periods on the effective date.

(g) If a title is designated noncompetitive on an interim basis, at the end of the interim noncompetitive period, which shall be no greater than one year, the job title shall be redesignated as competitive. Individuals appointed during the interim noncompetitive period shall, upon successful completion of their working test periods, attain permanent status in the competitive division.

That regulation was adopted in July 1988. 20 N.J.R. 2255(b) (Sept. 6, 1988). We note that, in response to concerns about

A-0056-13T2

the nature of the administrative process preceding a reallocation from the competitive to the noncompetitive division, the agency responded that N.J.A.C. 4A:3-1.2(e) is supposed to "provide[] for a thorough administrative review process." 20 N.J.R. 2256(b) (Sept. 6, 1988).

In reaching its decision in this case, the Commission relied on N.J.A.C. 4A:3-1.2(c)(2), which allows transfers to the noncompetitive division when "[c]ertification procedures based on ranked eligible lists [would] not or are not likely to meet the needs of appointing authorities." Having reviewed the record before us, we conclude that it contains very few pieces of objective evidence, such as the "[d]ata, reports, analyses, and other information" contemplated by N.J.A.C. 4A:3-1.2(e)(1), demonstrating that the AOC was experiencing significant recruitment problems for the Probation Officer and Bilingual Probation Officer titles at the time it appealed. In support of its application, the AOC cited only one, not overly specific problem, which was that "at least four vicinages [had] exhausted [their] current pool and several others [were] close to exhausting their pools for the Probation Officer Bilingual title." The record does not contain more specific factual information concerning the parameters of that problem, such as how often it occurs and whether court operations had been

adversely affected. In addition, a shortage in the pool for the Bilingual Probation Officers would not, by itself, necessitate a reallocation of the Probation Officer title to the noncompetitive division, even if it were to justify the reallocation of Bilingual Probation Officers.

The Commission's decision quotes the Division's comment that there were "no eligible lists for the subject titles" at the time the decision to make the program permanent was made. It is silent, however, as to whether the lack of lists was related to an operational problem at the Commission, or merely the cessation of developing such lists while the pilot program was taking place and in anticipation that it would be made permanent. Certainly, the AOC was able to identify many candidates for the positions during the pilot project. We find it unlikely that the competitive process suddenly failed to produce eligible lists, inasmuch as the AOC has been relying on it for more than fifty years. The fact that the Commission was simply not ready to resume the usual procedure at the end of the pilot program is not an acceptable reason for making the program permanent.

The Commission points to the fact that the reallocation "[would] provide the AOC with the flexibility needed to more efficiently and quickly meet hiring responsibilities." However,

A-0056-13T2

the need for flexibility in hiring is not listed as one of the circumstances that would permit the Commission to place a job title in the noncompetitive division. N.J.A.C. 4A:3-1.2(c)(1) to -(3). Instead, N.J.A.C. 4A:3-1.2 allows for limited, interim noncompetitive appointments in the event that there is an immediate need for additional personnel.

The Association argues that the Commission should have held a hearing. N.J.S.A. 11A:3-6 only requires the Commission to hold a public hearing prior to transferring a title from the career service to the unclassified service. N.J.A.C. 4A:3-1.2(e), however, vests the Commission with the discretion to conduct a public hearing "[p]rior to any reallocation from the competitive to noncompetitive divisions." Because it does not mandate such a hearing, we cannot conclude that one is required. Nevertheless, in a fact-sensitive case such as this one appears to be, the Commission should seriously consider a transfer to the OAL for a hearing. See Commc'ns Workers of Am. v. N.J. Dep't of Pers., 154 N.J. 121, 131-32 (1998).

Finally, we return to the constitutional dimension of this case, which governs its outcome over and above the statutory and regulatory requirements discussed above. Because our Constitution requires that public service appointments be made by competitive examination "as far as practicable," Foglio,

supra, 207 N.J. at 40, consideration must be given to whether the AOC has demonstrated that it is impracticable for it to continue filling Probation Officer and Bilingual Probation Officer positions through open, competitive examinations. That is a question that must be considered separately as to each title. That the noncompetitive process is more flexible does not, in our view, mean that the competitive process is not practicable within the meaning of the constitutional requirement. We see nothing in the Commission's decision to suggest that it considered the constitutional issue, which was raised by the Association in its opposition.

Because the factual record underlying the Commission's decision is overly sparse, we conclude that there are insufficient facts to support the decision to grant the transfer of the Probation Officer and Bilingual Probation Officer titles to the noncompetitive division, rendering it arbitrary and capricious. In addition, and more importantly, the Commission's failure even to consider the issue of whether it is impracticable for the AOC to continue filling Probation Officer and Bilingual Probation Officer positions through open, competitive examinations renders the decision legally defective.

Consequently, we reverse the order on appeal and remand for further consideration by the Commission, consistent with this

A-0056-13T2

opinion. The Commission's reconsideration must include the development of the type of factual record required for a meaningful evaluation of the AOC's proposal under the applicable statutory and regulatory provisions and, again most importantly, the provisions of article VII, section 1, paragraph 2 of the New Jersey Constitution.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION