**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1745-18T1

JSTAR, LLC,

  Appellant,

v.

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION -LAND USE
REGULATION PROGRAM

and

RTS IV, LLC a/k/a JOSEPH R.
PRESTIFILIPPO, JR., No
1506-04-0203.6 CAF180001,

  Respondents.

_____

Submitted March 23, 2020 – Decided July 16, 2020

Before Judges Rothstadt, Moynihan and Mitterhoff.

On appeal from the New Jersey Department of Environmental Protection.

R.C. Shea & Associates, attorneys for appellant (Robert C. Shea, of counsel; Dina M. Vicari, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Donna Arons, Assistant Attorney General, of counsel; Jason Brandon Kane, Deputy Attorney General, on the brief).

King Kitrick Jackson McWeeney & Wells, LLC, attorneys for respondent RTS (John J. Jackson III and Jilian L. McLeer, on the brief).

PER CURIAM

JSTAR, LLC appeals from the New Jersey Department of Environmental Protection's (DEP) November 8, 2018 final agency decision, granting a Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, Individual Permit to RTS IV, LLC (RTS). The CAFRA permit was issued in connection with RTS's proposal to construct a residential development in Brick Township to be called "Osborn Estates." The development called for the construction of seven single-family homes located on a portion of a former residential community that was commonly known as "Camp Osborn" that had been destroyed by Superstorm Sandy.

On appeal, JSTAR argues that: (1) RTS failed to provide the public with proper notice of its CAFRA permit application, as both the description of the proposed development was insufficient and property owners entitled to notice were never notified; (2) JSTAR, as well as the public, was not afforded adequate

due process; (3) RTS's application was not "substantiated by sufficient information and empirical data," thus violating numerous regulatory provisions; and (4) RTS is precluded from modifying its CAFRA permit. We affirm, as we conclude that JSTAR failed to establish that the DEP's granting of the CAFRA permit was arbitrary, capricious, or unreasonable, and its arguments to the contrary are without merit.

## I.

## The Property and the Project

RTS's site is approximately 1.405 acres and located in Block 36 Lot 12. Cummings Street, which was also destroyed by Superstorm Sandy, is located on RTS's property and runs west to east from Route 35.[1] It lies between the proposed Osborn Estates and property that is being redeveloped by the Osborn Sea-Bay Condominium Association (OSBCA) that is located in Block 13.[2] In

---

[1] "Cummings Street" is at times referred to in the record as "Cummins Street."

[2] In In re JSTAR, LLC v. N.J. Department of Environmental Protection-Land Use Regulation Program, No. A-4483-17, (App. Div. Apr. 27, 2020) (JSTAR I), we affirmed the DEP's issuance of a CAFRA permit for OSBCA's project. In that opinion, we rejected challenges raised by JSTAR that were similar, if not identical, to many of those raised in the present appeal.

OSBCA's proposal called for, among other things, the construction of an extension of Cummings Street that would run from north to south on its property, eventually connecting with the east-west portion of Cummings Street that RTS proposed to redevelop.

addition to the seven single-family homes, RTS's proposed development called for the reconstruction of Cummings Street, and the construction of a six-foot-wide dune walkover, allowing beach access for Osborn Estates residents.

OSBCA's property is to the north of RTS's proposed development, and single-family residences are located to the south in Block 36 Lots 11.01 through 11. JSTAR owns the property on Lots 11.06 and 11.07 in Block 36. To the east of RTS's property lies the United States Army Corps. of Engineers (Army Corps.) dune project adjacent to the beach. Route 35 lies to the west.

The CAFRA Individual Permit Application

On June 26, 2018, RTS submitted an application requesting a CAFRA permit for Osborn Estates. Included in RTS's application was a CAFRA Individual Permit Environmental Impact Statement (EIS) rendered by DuBois Environmental Consultants (Dubois), as well as a Stormwater Management Report prepared by Lindstrom, Diessner & Carr, P.C. (LDC).

RTS submitted notice of its application by certified mail to the Planning Board and Soil Conservation District of Ocean County, as well as the Construction Official, Planning Board, and Environmental Commission of Brick Township. It also published a copy of the notice in the Asbury Park Press.

4

In a letter dated July 25, 2018, the DEP notified RTS that its application was sufficient, that it would be considered and published in the DEP Bulletin on August 15, 2018, and it would be subject to a public comment period of thirty days from the date of the publication. The letter required RTS to provide notice of the public comment period in accordance with N.J.A.C. 7:7-24.4, including "[n]otification, by certified mail, to all owners of real property, including easements, as shown on [the] current tax duplicate, within 200 feet of the . . . properties on which the proposed development would occur."

On July 31, 2018, RTS sent letters, by certified mail, notifying property owners within 200 feet of Osborn Estates, as determined by the municipality, of its permit application. The notice advised that the thirty-day public comment period would begin on August 15, 2018, and that RTS's complete application could be viewed at the municipal clerk's office or by appointment at the DEP's office in Trenton. The notice directed that written comments could be submitted to the DEP. Appended to the notice was a copy of the Osborn Estates site plan.

On July 23, 2018, the DEP contacted Dubois, requesting a copy of a Letter of Map Revision (LOMR) issued by the Federal Emergency Management Agency (FEMA) for RTS's proposed development. The DEP also requested that RTS provide it with supplemental information concerning flood elevation levels

based on the LOMR, as well as information concerning a gravel roadway existing on the property. In response, LDC emailed the requested information, attaching a copy of the LOMR issued by FEMA. The DEP later requested that LDC revise the flood hazard notes and the development's grading and utilities plan. LDC made the requested revisions on behalf of RTS.

On August 15, 2018, the DEP published RTS's permit application in the DEP Bulletin. The publication described the requested permit, informed readers of the date that the application was received, and indicated the thirty-day public comment period had begun.

In an August 29, 2018 letter to the DEP, JSTAR objected to the permit being issued to RTS. JSTAR attached two reports, prepared by separate consulting firms, concluding that RTS's proposed development did not comply with the DEP's Coastal Zone Management (CZM) rules, N.J.A.C. 7:7-1.1 to -29.10, and the Flood Hazard Area Control Act (FHACA) rules, N.J.A.C. 7:13-1.1 to -24.11. RTS sent the DEP a September 25, 2018 letter responding to the arguments raised by JSTAR. RTS also included a supplemental policy compliance statement.

On November 1, 2018, the DEP issued an environmental report for Osborn Estates, concluding:

[T]he applicable CAFRA findings, as required by [s]ection [ten] of the [a]ct, and as embodied in the Rules on [CZM], will be met by the permittee provided all permit conditions are met. A CAFRA permit containing permit conditions is expressly contingent upon compliance with those conditions, and failure to comply with any or all of the permit conditions may result in appropriate enforcement actions, or suspension or revocation of the permit.

The DEP's Bureau of Coastal Regulation (Bureau) issued a November 7, 2018 engineering report that concluded RTS's proposal satisfied the FHACA rules and Stormwater Management rules, N.J.A.C. 7:8-1.1 to -6.3. The Bureau recommended that the DEP approve the engineering components of RTS's proposal, subject to several conditions.[3]

The next day, the DEP issued CAFRA Permit No. 1506-04-0203.6 CAF180001 to RTS. According to the permit, Osborn Estates consisted of "seven . . . [two and a half] story, single family dwellings with [an] associated sewer line, a stormwater management system, a beach access dune crossover and other associated development including the reconstruction of Cummin[g]s Street as shown on nine . . . sheets . . . prepared by [LDC]." On November 21,

---

[3] The conditions referenced in both the environmental and engineering reports are specified on RTS's CAFRA permit. They range from prohibiting construction of habitable areas below the elevation listed on the grading and utilities plan to modifying the deeds to inform purchasers of the flood risks associated with the property.

7                                              A-1745-18T1

2018, the DEP published RTS's permit in the DEP Bulletin. This appeal followed.

II.

We accord substantial deference to a state administrative agency to the extent it acts within its sphere of delegated functions. In re Stallworth, 208 N.J. 182, 194 (2011). We will uphold an agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). In evaluating whether a decision was arbitrary, capricious, or unreasonable, we examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

Similarly, we accord substantial deference to an "agency's interpretation of statutes and regulations within its implementing and enforcing

responsibility." E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 355 (App. Div. 2010) (quoting Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001)). In our review, we defer to an agency's expertise. As we have observed:

> [J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to . . . deal [] with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues . . . .' "[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." The court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs."
>
> [In re Adoption of Amendments to Ne., Upper Raritan, Sussex Cty. & Upper Del. Water Quality Mgmt. Plans, 435 N.J. Super. 571, 583-84 (App. Div. 2014) (alterations in original) (citations omitted).]

For those reasons, where an agency's expertise is a factor, we will defer to that expertise, particularly in cases involving technical matters within the agency's special competence. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004). This deference is even stronger when the agency, like the DEP, "has been delegated discretion to determine the specialized and

technical procedures for its tasks." City of Newark v. Nat. Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 540 (1980). We are therefore "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs." In re Reallocation of Prob. Officer, 441 N.J. Super. 434, 444 (App. Div. 2015) (quoting In re N.J. Pinelands Comm'n Resolution PC4-00-89, 356 N.J. Super. 363, 372 (App. Div. 2003)).

Despite our deference, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." U.S. Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012) (quoting Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Envtl. Prot., 191 N.J. 38, 48 (2007)). "When 'the issue involves the interpretation of statutes and regulations, it is a purely legal issue, which [is] consider[ed] de novo.'" Pinelands Pres. All. v. N.J. Dep't of Envtl. Prot., 436 N.J. Super. 510, 524-25 (2014) (quoting Klawitter v. City of Trenton, 395 N.J. Super. 302, 318 (App. Div. 2007)).

### III.

### Notice

We first address JSTAR's contention that RTS's notice was defective because RTS's description of the project in its application was insufficient and notice was not sent to all entitled property owners. According to JSTAR, the

10

description of the project failed to provide the complete proposed use for Cummings Street, and the notice should have been extended to other property owners within 200 feet of both RTS's and OSBCA's properties since residents from both would be using Cummings Street. Additionally, a proposed five-foot road-widening easement and a curb cut located along Route 35 necessitated extending notice to all of those same property owners.

As JSTAR raised substantially similar challenges to OSBCA's notice, which we addressed in our earlier opinion, we incorporate by reference our earlier discussion of the legal principles that we concluded applied to the required notices for a CAFRA permit application. These same principles governed RTS's application. See JSTAR I, slip op. at 13-15.

With those principles in mind, we turn to RTS's notice. RTS's notice advised the nearby property owners of its application for the permit, described the project, and informed interested parties that the full application could be viewed either at the municipal clerk's office or the DEP's office. As part of its notice, RTS stated it was seeking a "CAFRA [i]ndividual [p]ermit for a residential project with seven . . . proposed single-family dwellings, an access road, and one . . . six . . . foot wide at grade walkover for beach access." Further, the notice identified the street address as "Route 35 and Cummin[g]s Street."

11

JSTAR contends, relying principally on the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, and N.J.A.C. 7:7-24.3, that RTS's notice was deficient because it failed to advise nearby property owners that Cummings Street would be used by both Osborn Estates residents and OSBCA residents since Cummings Street was integral and essential to both sets of residents. Therefore, RTS's proposal "did not accurately reflect the 'location and boundaries of the project site and depicting the proposed development.'" N.J.A.C. 7:7-24.3(d)(1)(ii). There is no merit to JSTAR's contention.

First, the MLUL does not dictate the contents of a CAFRA permit application's notice. See JSTAR I, slip op. at 17. Second, under the applicable CZM rules, RTS's notice was required to briefly describe the proposed project, provide a site plan detailing the development's location and boundaries depicted in relation to existing site conditions, and provide a copy of the DEP's form notice letter. See N.J.A.C. 7:7-24.3(d) and -24.4(d). RTS complied with those requirements. There was no requirement that RTS had to specify that Cummings Street would be used by its residents or others.

JSTAR's second notice argument, that not all property owners entitled to notice were provided with such notice, is similarly without merit. As JSTAR did in JSTAR I, it cites to Brower Development Corp. v. Planning Board of the

Township of Clinton, 255 N.J. Super. 262, 267-70 (App. Div. 1992), and argues here that because Cummings Street was an "improvement essential to the proposed RTS [s]ite and the OSBCA [s]ite", "RTS should have properly requested a property owners list from Brick Township and notified all landowners within 200 feet of Block 36, Lot 13, as ordered in Brower."

We again find JSTAR's reliance on Brower to be inapposite essentially for the reasons stated in our earlier opinion. See JSTAR I, slip op. at 17-18. We conclude that JSTAR's contention in this matter about the scope of RTS's notice is equally without merit. Contrary to JSTAR's assertions here, RTS, like OSBCA, did not plan for an extension of Cummings Street beyond the confines of its property. No additional notice was required.

JSTAR also argues that four property owners never received proper notice, four other property owners should have been given multiple notices since they owned multiple properties within 200 feet of the project, notice should have been extended beyond the initial 200 feet of the project because of an easement within OSBCA's property, and similarly, a proposed curb cut for Cummings Street that would extend onto Route 35 required the boundaries for notice being extended. We are not persuaded by these contentions.

13

First, while JSTAR contends that four property owners within 200 feet of RTS's development did not receive notice of its application, its contention is belied by certifications filed in this appeal in accordance with an order we granted for leave to supplement the record. The certifications from the four homeowners that supplemented the record confirmed that they were properly noticed and had no objection to RTS's application. Second, as to JSTAR's contention that multiple notices should have been sent to some of the property owners because they owned multiple properties, the CZM rules merely require that owners be sent notice. The number of properties one owns is irrelevant under the rules. See N.J.A.C. 7:7-24.3(b)(6).

Also, JSTAR's contention, that because RTS's site plan indicated both a five-foot road-widening easement and "a portion of the Cummin[g]s Street driveway entrance curb cut located along Route 35," are located on OSBCA's site, RTS should have provided notice to all property owners within 200 feet of OBSCA's property as well, is factually incorrect. RTS was not proposing to develop the area cited by JSTAR. As its site plan showed, the five-foot road-widening easement lies just beyond RTS's property line and Cummings Street. This is indicated on the site plan by "edge of access road at property line," denoting where RTS's proposed development of Cummings Street ends.

A-1745-18T1

Further, N.J.A.C. 7:7-24.3(b)(6) merely contemplates that notice be given to easement holders within 200 feet of the development, not that the existence of an easement would expand the range of notice required. RTS does not propose to extend development beyond the boundaries of its lot, thereby limiting the required notice to 200 feet of Lot 12.

<u>Due Process and the Public Comment Period</u>

We next turn our attention to JSTAR's due process argument. JSTAR contends that the DEP violated JSTAR's procedural due process rights when the DEP declined to communicate with JSTAR throughout the public comment period.[4] Here, again, JSTAR raises an argument that is substantially the same as one it raised in <u>JSTAR I</u>. <u>See</u> <u>JSTAR I</u>, slip op. at 19. We therefore incorporate the legal principles we discussed in our earlier opinion, <u>id.</u> at 19-21, and conclude that there was no violation of JSTAR's, or the public's, due process rights.

_____

[4] In doing so, it relies upon <u>DeBlasio v. Zoning Board of Adjustment of West Amwell</u>, 53 F.3d 592, 597 (3d Cir. 1995), <u>overruled on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington</u>, 316 F.3d 392 (3d Cir. 2003), to argue that the DEP's failure to communicate with JSTAR throughout the public comment period was a violation of procedural due process. We conclude that its reliance on <u>DeBlasio</u> is without merit given the thirty-day public comment period, during which JSTAR submitted its objections to the DEP.

Here, the record demonstrates that the DEP held the thirty-day public comment period, of which JSTAR took advantage by submitting its objections to RTS's application. JSTAR brought to the DEP's attention data, views, and arguments that it felt should be considered by the DEP in deciding whether to grant the permit. See In re Issuance of Access Conforming Lot Permit No. A-17-N-N040-2007, 417 N.J. Super. 115, 130 (App. Div. 2010). Following JSTAR's objection, RTS responded to each of JSTAR's contentions, and the DEP considered JSTAR's arguments.

JSTAR's insistence that the DEP was obligated to respond to it lacks merit, as due process only requires JSTAR have an opportunity to respond to the permit application. The thirty-day comment period provided such due process. "[W]hen a state 'affords a full judicial mechanism with which to challenge the administrative decision' in question, the state provides adequate procedural due process." DeBlasio, 53 F.3d at 597 (quoting Bello v. Walker, 840 F.2d 1124, 1128 (1988), overruled on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington, 316 F.3d 392 (3d Cir. 2003)).

Sufficiency of Information to Support Issuing the Permit

We next turn to JSTAR's contention that RTS's CAFRA permit "was not substantiated by sufficient information and empirical data." Specifically,

16

JSTAR argues that the DEP's issuing the permit violated N.J.A.C. 7:13-12.6 – requirements for a railroad, roadway, and parking area; N.J.A.C. 7:7-16.11 – buffers and compatibility of uses; N.J.A.C. 7:7-9.16 – dunes; and N.J.A.C. 7:7-9.36 – endangered or threatened wildlife or plant species habitats. As a result of these violations, JSTAR thus argues that the permit must be suspended under N.J.A.C. 7:7-27.7.

A.

JSTAR's first contention is that RTS failed to comply with N.J.A.C. 7:7-9.25 because its proposed roadways would not be built at the correct elevation and additionally, RTS failed to meet the exemption in the event it was infeasible to build the roadways high enough under N.J.A.C. 7:13-12.6(e)(1)(i) to (iv). Specifically, JSTAR contends that RTS did not satisfy N.J.A.C. 7:13-12.6(e)(1)(i) to (iv).

Here, again, JSTAR has raised another contention that we evaluated in our earlier opinion as it related to OSBCA's application. See JSTAR I, slip op. at 22-23. We therefore again incorporate our explanation of the governing legal principles set forth in that opinion. Suffice it to say here, as we did there, the CZM rules required for RTS to either construct Cummings Street "at least one foot

above the flood hazard area design flood elevation," or meet the requirements for an exemption by showing that the construction requirement was not feasible. Ibid.

In support of its argument, JSTAR refers to an expert report, rendered on its behalf by a consulting firm, finding that RTS made no effort to raise Cummings Street to the required flood hazard elevation and that it had no valid reasons for failing to attempt to do so. RTS, however, addressed the flood hazard elevation requirement in its supplemental policy compliance statement dated September 2018.

This report explained in detail why it was not feasible to reconstruct Cummings Street in conformance with the regulation; not only because of increased construction costs, but primarily because of Cummings Street's relationship to Route 35. According to the supplemental report, the current project involved reconstructing Cummings Street as an access roadway for the development, and that

> [t]he existing grade is at elevation five . . . to seven . . .
> feet associated at the proposed driveway location.
> Construction of a new roadway at one . . . foot above
> the L.O.M.R. flood hazard elevation of [eight] feet in
> the AE zone[5] is not practicable as it would raise the road

---

[5]  According to FEMA, Zone AE includes "[a]reas subject to inundation by the [one]-percent-annual-chance flood event determined by detailed methods." Zone AE and A1-30, FEMA, https://www.fema.gov/zone-ae-and-a1-30# (last updated March 27, 2018).

above the existing grade by approximately [four] feet. This would result in excessive fill and the requirement for guard rails and retaining walls such that the cost would be prohibitive.

Additional fill would be required to meet the AO zone[6] requirements. Construction of the roadway more than one . . . foot higher than the referenced three . . . foot depth in the AO zone as per the L.O.M.R. reference is also not practical as the roadway would be approximately [four] feet above existing grade.

The report also addressed N.J.A.C. 7:13-12.6(e)(1), stating (i) there would be significant construction costs to comply with elevation requirements based on the excessive fill and the need for retaining walls and guide rails; (ii) because any people leaving the development would need to exit onto Route 35 at an elevation four feet lower than the flood elevation of eight feet, the construction costs would be excessive and disproportionate to the benefit derived; (iii) the amount of fill needed would be excessive, at an average of four feet, to satisfy the flood zone requirements; and that subsection (iv) did not apply.

The report thus concluded:

[T]he limiting elevation for ingress and egress for this single family development is . . . Route 35. Th[e]

---

[6] FEMA states that Zone AO is an area "subject to inundation by [one]-percent-annual-chance shallow flooding . . . where average depths are between one and three feet." Zone AO, FEMA, https://www.fema.gov/zone-ao (last updated May 23, 2019).

highway was recently reconstructed. It was not raised to the required level of [one] foot above the [b]ase [f]lood [e]levation of [eight] feet. Since . . . Route 35 is approximately [e]levation [five] in this area, raising the onsite roadway to elevation [nine plus] would require [four feet] or more of fill, be costly and would serve no meaningful purpose because the highway itself would be inundated with flood waters during a 100 [y]ear [f]lood event.

For the reasons set forth above . . . it is not feasible to construct the roadway above the flood elevation and that sufficient reasons have been provided to demonstrate that the project meets the requirements for approval. The appropriate deed notification as required in [N.J.A.C. 7:13-12.6(f)] is offered in lieu of raising the roadway to [one] foot above the [b]ase [f]lood [e]levation.

After reviewing RTS's application, the DEP adopted the supplemental policy compliance statement's Route 35 flooding concerns, concluding in its engineering report that "[i]t has been satisfactorily demonstrated in the compliance statement, in accordance with N.J.A.C. 7:13-12.6, that it is not feasible to elevate the travel surfaces of the proposed driveways, access ways and internal roads at least one foot above the regulatory flood hazard elevation."

In its arguments challenging the DEP's decision, JSTAR fails to acknowledge the DEP's Route 35 flooding concerns, as stated in the supplemental policy compliance statement. Since Route 35, the only road to

20

exit the barrier island, was constructed at such a low flood hazard elevation, raising Cummings Street is both impractical and inconsequential.

Applying our discretionary standard of review, we conclude that the DEP properly exercised its discretion by granting RTS an exemption based on the negative impact that strictly adhering to the flood elevation requirements would have on Route 35 and its propensity to flood. Under these conditions, the DEP's granting RTS an exemption under N.J.A.C. 7:13-12.6 was supported by sufficient evidence in the record.

B.

Next, JSTAR argues that RTS's proposed development failed to satisfy N.J.A.C. 7:7-16.11, and JSTAR's explanation for not complying with the regulation was insufficient. Specifically, JSTAR contends that "the setbacks of the proposed project, particularly the front and side yard setbacks, make the buffers provided inadequate." We disagree.

Under N.J.A.C. 7:7-16.11(b), a development must "be compatible with adjacent land uses to the maximum extent practicable." In this regard, "[d]evelopment that is likely to adversely affect . . . residential . . . uses, is prohibited unless the impact is mitigated by an adequate buffer." N.J.A.C. 7:7-16.11(b)(1).

21

A buffer is defined as a "natural or man-made area[], structure[], or object[] that serve[s] to separate distinct uses or areas."  N.J.A.C. 7:7-16.11(a). The purpose of the buffer is to promote "compatibility of uses," or "the ability for uses to exist together without aesthetic or functional conflicts."  N.J.A.C. 7:7-16.11(a).  "The purpose, width, and type of the required buffer shall vary depending upon the type and degree of impact and the type of adjacent area to be affected by the development, and shall be determined on a case-by-case basis."  N.J.A.C. 7:7-16.11(b)(1).

As part of its EIS, RTS stated:

> The project is [a] redevelopment of a prior residential community that was associated with minimal buffer to surrounding properties due to the extensive number of dwelling units throughout the community (on and off-site).  The proposed project will maintain the dune and beach area to ensure compatibility and avoid functional conflict with the beach and water to the east.  Each lot is required to be associated with landscaping to consist of a minimum of one . . . tree and ten . . . shrubs or grasses per lot, which will provide additional buffer to surrounding residential lots.  Landscaping and seeding is also proposed along the Route 35 boundary of the site . . . .  The overall project is compatible and consistent with surrounding residential land use.  The project is in compliance with [N.J.A.C. 7:7-16.11].

JSTAR's argument before us focuses on the setback front and side yards which, according to JSTAR, made the proposed buffer of the shrubs and trees

inadequate under N.J.A.C. 7:7-16.11. JSTAR argues that RTS was obligated to explain how its proposed buffers complied with N.J.A.C. 7:7-16.11 given its yard setbacks and yet failed to do so. While JSTAR questions whether the setbacks proposed by RTS satisfied the code's requirements, it has provided no applicable case law or statutory authority indicating that yard setbacks are in any way related to buffers. Applying our deferential standard of review, we conclude that the DEP correctly determined that RTS's application was not barred by N.J.A.C. 7:7-16.11, as is evident from the DEP's engineering report stating any issue with buffers was "N/A."

## C.

JSTAR next challenges the DEP's environmental report, which concluded that Osborn Estates was not located on a dune, and therefore N.J.A.C. 7:7-9.16 was inapplicable. While we, and now on appeal, the DEP, agree with JSTAR that the regulation was applicable because of RTS's proposed construction of a walkover on the dunes, we conclude that the DEP considered RTS's application with that knowledge and therefore did not err in issuing the permit.

N.J.A.C. 7:7-9.16(b) prohibits development on dunes unless the construction "has no practicable or feasible alternative in an area other than a dune, and that will not cause significant adverse long-term impacts on the

natural functioning of the beach and dune system." The regulation identifies "acceptable activities" to include "[l]imited stairs, walkways, pathways, and boardwalks to permit access across dunes to beaches, in accordance with N.J.A.C. 7:7-10, provided they cause minimum feasible interference with the beach and dune system." N.J.A.C. 7:7-9.16(b)(3).

In its EIS, RTS stated that no proposed structures would be within the dune's limits, and that dune development would be limited to the proposed walkover for beach access from the residences. It specified that the walkway, which would be six-feet wide and constructed from "plank walk" or "mobimat," would have sand or split-rail fencing along each side of the walkway to limit access to the dune surrounding the walkway. It also explained that the perimeter of the dune walkover would be replanted with American beachgrass to address any temporary disturbances from construction.

While the DEP acknowledges that its environmental report incorrectly concluded that N.J.A.C. 7:7-9.16 was inapplicable, the DEP considered the proposed use of the nearby dune when it rendered its environmental report. The DEP stated that the dune walkover was otherwise permissible, as it complied with N.J.A.C. 7:7-9.16(b)(3), as well as additional requirements delineated under N.J.A.C. 7:7-

10.4(f).[7] Thus, even though the DEP incorrectly concluded that the regulation was inapplicable, it granted RTS's application with full knowledge that the dune walkover was being proposed and there was no evidence that the proposed walkover contravened any regulation. As such, the DEP's determination to grant RTS a CAFRA permit was not arbitrary, capricious, or unreasonable.

D.

Next, we turn our attention to JSTAR's contention that the DEP also failed to properly apply N.J.A.C. 7:7-9.36, because it found the regulation inapplicable and RTS never addressed it. JSTAR argues that the regulation is applicable, as least tern, an endangered bird species, maintains a foraging habitat on RTS's proposed site.

Under N.J.A.C. 7:7-9.36(b),

> [d]evelopment of endangered or threatened wildlife or plant species habitat is prohibited unless it can be demonstrated, through an endangered or threatened wildlife or plant species impact assessment . . . that endangered or threatened wildlife or plant species habitat would not directly or through secondary impacts on the relevant site or in the surrounding area be adversely affected.

---

[7] NJAC 7:7-10.4(f) requires the dune walkover to not exceed six feet in width, to not result in lowering of the beach, and to have fencing on both sides.

Here, JSTAR's N.J.A.C. 7:7-9.36 contentions are belied by the record. According to JSTAR, a report prepared on its behalf concluded that RTS failed to conduct a species survey at all and further failed to explain "how the at grade walkover and associated fencing will not have adverse impacts to [the] least tern nesting habitat or sea beach amaranth habitat and how [these] critical habitat[s] will be protected." However, RTS's EIS stated that while the proposed site is home to the least tern, its habitat would "not . . . be disturbed as part of any residential development." The EIS also detailed that RTS's proposed walkover would likewise "have no significant adverse impacts to any critical least tern nesting habitat."

Moreover, Dubois, on behalf of RTS, requested that the DEP's Natural Heritage Program provide it with "documented occurrences or critical habitat on and in the vicinity of the site," which identified several species located off-site in the nearby Atlantic Ocean. Dubois determined that the development would "not result in any direct or indirect adverse impacts to threatened or endangered species population or habitat," thereby satisfying N.J.A.C. 7:7-9.36.

Thereafter, the DEP found that because the property had not been mapped as an endangered or threatened species habitat, N.J.A.C. 7:7-9.36 did not apply. We agree. The findings reported by Dubois serve as substantial evidence that

the property was not considered a critical habitat for any species. See N.J.A.C. 7:7-9.36(b). This determination is supported by the DEP's own resources, as Dubois contacted the Natural Heritage Program to provide it with information about nearby endangered species habitats. As such, we conclude that the DEP's determination that N.J.A.C. 7:7-9.36 was inapplicable was not arbitrary, capricious, or unreasonable.

## RTS's Prohibition from Seeking Modification

Last, JSTAR argues here, as it did in opposition to OSBCA's application, that under N.J.A.C. 7:7-27.5, RTS is precluded from filing a modification of its individual permit and therefore is required to file an entirely new application because of its failure to include the Cummings Street property as part of its public notice. We conclude that this argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(D). See JSTAR I, slip op. at 30-31.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1745-18T1